**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

_____
                                                    :
ANDREA DE LA TORRE,                 :
                                                    :
                            Plaintiff,           :
                                                    :        Civil No. 13-127 (RBK/AMD)
            v.                                       :
                                                    :        **OPINION**
                                                    :
LOCKHEED MARTIN CORPORATION,   :
                                                    :
                            Defendant.       :
_____:

**KUGLER**, United States District Judge:

        In this case, Plaintiff Andrea de la Torre ("Plaintiff") asserts claims of gender

discrimination under Title VII of the Civil Rights Act of 1964 and the New Jersey Law Against

Discrimination, N.J. Stat. Ann. § 10:5-1 <u>et seq.</u> ("NJLAD"), against her former employer,

Defendant Lockheed Martin Corporation ("Lockheed").  Currently before the Court is

Lockheed's motion for summary judgment.  (Doc. No. 538).  For the reasons stated herein, Court

will **GRANT** Lockheed's motion.

**I.        BACKGROUND**[1]

        Plaintiff's action arises out of her employment with Lockheed, "the largest information

technology services [ ] [supplier] to the United States government."  (Fourth Am. Compl. ¶ 15,

---

[1] When considering a defendant's motion for summary judgment, the Court views the facts underlying the claims in
the light most favorable to the plaintiff.  <u>See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.</u>, 998
F.2d 1224, 1230 (3d Cir. 1993).  As the factual background of this case has been discussed in detail in the Court's
prior Opinions, (<u>see</u> Doc. Nos. 262, 372), the Court will only examine those facts necessary for the resolution of the
instant motion.

Doc. No. 494.) Plaintiff contends that because of her gender Lockheed failed to promote her into certain roles, and that she was underpaid.

1. Plaintiff's Employment History

Plaintiff began her employment with Lockheed in May 2001 as a Level 3 Senior Cost Analyst for the AEGIS Weapon System Product Test Center. (Def.'s Statement of Undisputed Material Facts ("Def.'s SUMF") ¶ 1; Plaintiff's Response to Defendant's Statement of Undisputed Material Facts ("Pl.'s Resp.") ¶ 1.[2]) In 2004, Plaintiff was selected for a Level 4 Multi-Functional Financial Associate Manager role in the corporate Global Supply Chain Management ("GSCM") department. (Def.'s SUMF ¶ 2.) In this position, Plaintiff had one direct report who was also a Level 4 employee. (Id. ¶ 3.)

In October 2007, GSCM was restructured and Lockheed reclassified Plaintiff's position as Level 4 Multi-Functional Financial Analyst Staff. (Id. ¶ 4.) In this role, Plaintiff was an individual contributor and thus no longer had a direct report; she began reporting to Kurt Ravenfeld, a Lockheed Director. (Id. ¶ 5; Pl.'s Statement of Disputed Material Facts ("Pl.'s SDMF") ¶ 10.) In this role, Plaintiff's duties included assessing the financial health of Lockheed's suppliers by conducting supplier risk assessment analyses; performing industry analysis activities, which involved analyzing the broader industry in which a supplier operated and the pricing of commodities upon which the industry depended; and, providing risk assessments to various internal clients who were responsible for determining how to best manage

---

[2] Plaintiff states she began her employment with Lockheed in April 2001, however, the document she cites in support of this statement does not reference the exact month her employment again, and thus does not contradict Lockheed's statement that her employment began in May. This distinction is immaterial, however, for purposes of resolving the instant motion.

these risks while providing her own recommendations based upon her research. (Def.'s SUMF ¶¶ 6-8.[3],[4])

2. The Promotion of John Seto to a Team Lead Role

In January 2008, Mr. Ravenfeld promoted John Seto, one of his direct reports and a Level 4 Procurement Engineer, to a team lead role in a "stretch capacity." (Id. ¶ 10, Deposition of Kurt R. Ravenfeld, dated Apr. 22, 2013 ("Ravenfeld Dep.") 172:6-13.) As described by Mr. Ravenfeld, a "stretch" assignment is an opportunity given to a Lockheed employee so he or she may demonstrate skills and abilities outside of his or her current scope. (Ravenfeld Dep. 141:16-142:5.) This position tends to be above the employee's existing area of responsibility. (Id.)

In selecting Mr. Seto for this stretch assignment, Mr. Ravenfeld evaluated his (1) "sustained performance," i.e., his performance history; (2) "talent potential"; and (3) expertise in the area of responsibility, e.g., strategic planning and procurement engineering. (Ravenfeld Dep. 161:4-163:19.) Mr. Seto had reported to Mr. Ravenfeld for several years prior to this promotion. (Def.'s SUMF ¶ 12.)

As a team lead, Mr. Seto managed day-to-day responsibilities. (Def.'s SUMF ¶ 13.) Several months later, Mr. Seto received a growth promotion and his Job Level increased from Level 4 to Level 5. (Ravenfeld Dep. 172:6-13; Def.'s SUMF ¶ 14.) Consistent with Lockheed's

---

[3] To the extent Plaintiff denies these statements, the Court finds the majority of her objections to be without merit. Illustratively, she objects to Lockheed's characterization of her position in paragraph 6 as too limited in scope; however, the tasks she argues she performed, and that were omitted in this paragraph, are set forth by Lockheed in paragraph 7. (Def.'s SUMF ¶¶ 6-7; Pl.'s Resp. ¶ 6.) Moving on, she denies paragraph 7 in part, but then admits the entirety of this statement. (Pl.'s Resp. ¶ 7.) However, as to paragraph 8, the Court agrees that Plaintiff testified that she also provided her own recommendations as to "how best to manage [certain] risks, and incorporates this into its recitation of the facts. (Id. ¶ 8; Pl.'s Dep. 33:4-23.)

[4] The Court also notes that throughout the parties' respective Local Civil Rule 56.1 Statements, they often deny facts that are plainly supported by the cited portions of the record or advance legal arguments, which is inappropriate to do in these filings. See L. Civ. R. 56.1 cmt. d. Accordingly, the Court relies on these Statements to the extent that the parties are in agreement as to a particular fact. Where the parties disagree, their respective statements cannot be reconciled, and they offer inappropriate or unhelpful hyperbole, the Court relies on the record.

internal policies, Mr. Seto's placement into this team lead role and his subsequent Job Level increase was not considered a vacant position and thus was not posted.  (Def.'s SUMF 15 ¶; Ravenfeld Dep. 155:1-24; Burkhardt Declaration in Support of Def's. Mot. for Summ. J. ("Burkhardt Decl.") Ex. 13, Policy on Recruitment and Hiring Practices.[5])

### 3.  Creation of The Strategic Supplier Management Department

In August 2008, GSCM underwent another reorganization, which resulted in the creation of a Strategic Supplier Management Department.  (Def.'s SUMF ¶¶ 16, 18.)  This department was to be tasked with supplier risk assessment and risk management and William Buonanni was selected to serve as the director of this department; he was given the authority to hire three direct reports:  two at Job Level 4 and one at Job Level 5.  (Id. ¶¶ 17, 19-20.)  One of the Level 4 positions was an Operations Researcher Staff role, the other was a Project Management & Planning Operations Representative Staff role.  (Id. ¶ 21.[6])  The Level 4 Operations Researcher Staff position was to include supplier risk assessment activities.  (Id. ¶ 22.)  The Level 5 position in Mr. Buonanni's organization was an Operations Researcher Senior Staff role, which focused on supplier risk management and risk mitigation efforts.  (Id. ¶ 26.)

As for the Level 4 Operations Researcher Staff position, Mr. Buonanni spoke with Mr. Ravenfeld about transferring Plaintiff into the role, and Mr. Ravenfeld recommended that rather than requiring Plaintiff to move to Mr. Buonanni's organization, they let Plaintiff decide whether she was interested in any of the positions in Mr. Buonanni's organization.  (Id. ¶ 24.)  Mr.

---

[5] To illustrate the issue identified in note 3 supra, Plaintiff acknowledges that this may have been consistent with Lockheed's internal policies, but objects on the ground that the position *did* need to be posted in order to avoid "the demonstrated discriminatory impact."  This legal argument has no place in a Rule 56.1 Statement.

[6] Plaintiff admits in part and denies in part this statement stating:  "It is admitted that the three positions were given these titles.  All else is denied."  Plaintiff cites to no authority in support of this contention, accordingly Defendant's statement is deemed admitted.

Buonanni agreed with this recommendation and did not require Plaintiff to transfer into the Level 4 position.  (Id. ¶ 25.)

Plaintiff ended up applying for the Level 5 Operations Researcher Senior Staff role, along with seventeen other candidates; three candidates were women and fifteen were men.  (Id. ¶ 28.) Mr. Buonanni eventually selected three men, Kurt Wohlgemuth, Joseph D'Abate, and Al Sherwin, to interview for the Level 5 position.  (Pl.'s SDMF ¶ 168.)  And, according to Mr. Buonanni he selected these candidates on the basis of a resume review, focusing on resumes which showed (1) risk management experience and (2) experience leading cross-Business Area teams.  (Id. ¶¶ 166-67.)  Illustratively, Mr. Wohlgemuth's resume detailed his strengths as "Financial Management and Control . . . and Customer/Vendor Risk Management[, with] [s]pecific expertise in Financial Analysis and Reporting, Cash and Risk Management, competitive Product Pricing, and Productivity Analysis."  (Burkhardt Decl., Ex. 15.)  Out of the three men interviewed, he was subsequently selected for the Level 5 position.  (Def.'s SUMF ¶ 33.)

As for Plaintiff's candidacy, Mr. Buonanni testified that he did not interview Plaintiff because he did not believe she was qualified, i.e., the two major items he was looking for—risk management experience and experience leading cross-Business Area teams—were not in her resume.  (Buonanni Dep. 120:4-19.)  He further testified that after he made his decision concerning who he would interview, he had a telephone conversation with Plaintiff and informed her that he would like her to join his team in one of the Level 4 positions.  (Id. 118:3-12.) Plaintiff told Mr. Buonanni that she would accept this job and transfer into his group, but she also spoke with Mr. Ravenfeld to determine what role she would have in his organization if she decided not to transfer since her job duties were largely moving to Mr. Buonanni's organization.

(Def.'s SUMF ¶¶ 39-40.)  According to Plaintiff, Mr. Ravenfeld informed her that there would

be a job for her and that she would also "need to continue supporting Bob Hermida's[, a

Lockheed procurement engineer's,] IT work."  (Pl.'s Mem. in Opp'n to Lockheed Mot. for

Summ. J. ("Pl.'s Opp'n Br."), Fessenden Cert., Ex. 5, Deposition of Andrea de la Torre, dated

May 10, 2013 ("Pl.'s Dep.") 49:2-50:6.)  Plaintiff eventually decided that she did not want to

transfer into Mr. Buonanni's group and left him a voicemail to that effect on October 22, 2008.

(Def.'s SUMF ¶ 42.)

      Mr. Buonanni eventually selected Eric Szostak—who, like Plaintiff, had applied for the

Level 5 position and was not interviewed—for the Level 4 Operations Researcher Staff position

he had originally offered to Plaintiff.  (Def.'s SUMF ¶¶ 43-45.)  During the fall of 2008, Plaintiff

continued to work for Mr. Ravenfeld; however, the parties dispute the full scope of Plaintiff's

responsibilities.  Plaintiff states her responsibilities included, inter alia, analyzing supplier risk

and performing industry analyses, and supplier/risk management.  (Pl.'s SDMF ¶ 45; Pl.'s Dep.

51:12-18, 146:14-16; see also Pl.'s Opp'n Br., Affidavit of Andrea de la Torre ("Pl.'s Aff.") ¶ 62

("While reporting to Mr. Ravenfeld, I was involved in actively managing supplier risk.  When

my assessment of a Lockheed supplier's risk was unfavorable, I would work with supplier

representatives and recommend steps to mitigate the risk").)  Lockheed counters, however, that

Plaintiff continued to perform supplier risk assessment responsibilities during the fall of 2008,

but did not have experience actively managing risk.  (Def.'s Response to Pl.'s SDMF ("Def.'s

Resp.") ¶ 140 (citing Pl's Dep. 33:4-23 (stating that she would report her findings to project

managers who would decide whether to elevate a potential threat, and she would often provide a

recommendation to these individuals).)

4. <u>Plaintiff's Job Responsibilities Post Leave of Absence</u>

Plaintiff went on an approved leave of absence from November 2008 until February 2009. (Def.'s SUMF ¶ 46.) Lockheed states that when Plaintiff returned from her leave of absence, her supplier risk assessment duties had transitioned fully to Mr. Szostak. (Def.'s SUMF ¶ 47.) Plaintiff disputes this fact, however, and states that the Level 5 position awarded to Mr. Wohlgemuth was responsible for the majority of duties that Plaintiff had previously performed. (Pl.'s Resp. ¶ 47.)

To ensure that Plaintiff continued to have sufficient responsibilities to justify a role in Mr. Ravenfeld's group, Mr. Ravenfeld assigned Plaintiff new job duties. (Def.'s SUMF ¶ 48.) Plaintiff's new duties included responsibilities relating to Lockheed Martin 21st Century ("LM21"),[7] "EO event leadership," and assisting Robert Hermida. (Def.'s SUMF ¶ 49; Pl.'s Dep. 24:22-27:11 ("the rest was [IT] Industry Analysis and . . . taking on the responsibilities that [Robert] Hermida, who was the IT procurement engineer, did not have time to do [sic] for the IT Group").) Plaintiff also characterized her work as including "OE events" and "IT commodity

---

[7] Although Plaintiff disputes Lockheed's assertion that 30% to 35% of Plaintiff's time was spend on Lockheed Martin 21st Century ("LM21") and that she was told by "Kurt Ravenfeld and John Seto . . . [that] 20 percent of [her] responsibilities were to be [related to LM21]," Plaintiff's deposition testimony supports Lockheed's assertion. (Pl.'s Dep. 24:22-25:4 ("A lot of the time spent on the LM21, because you needed to travel, a lot of it was personal time invested over and above . . . the 40-hour workweek. So I would estimate in total the hours . . . probably 30 percent of my time, 30 to 35 percent.").)

As a side point, Lockheed often objects to Plaintiff's statements when she is relying on her deposition testimony and quoting what she was told by other individuals stating that this kind of evidence is hearsay and inadmissible. First, the Rule 56.1 statement is an inappropriate place to argue whether something constitutes hearsay and is thus inappropriate to consider in resolving a summary judgment motion. Second, all that is required of Plaintiff is that she put forth some evidence to create a genuine issue of material fact that *would* be admissible at trial. See <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred"). To the extent Plaintiff quotes certain of her co-workers and superiors, she would certainly be entitled to call them as witnesses at trial so they could testify as to these statements.

research and support," and noted that project managers would often seek out her assistance in negotiating their contracts. (Pl.'s Dep. 28:9-18.) In supporting Mr. Hermida, Plaintiff took over a greater role in connection with Lockheed's IT suppliers, particularly a company named IDC. (Pl.'s Dep. 55:8-24.) Plaintiff testified that at one point, a project manager asked her to travel with him/her to see certain IT suppliers, and that this was the kind of work that Mr. Hermida had performed before becoming heavily involved with a procurement project known as Procure to Pay or "P2P." (Pl.'s Dep. 56:1-7; Def.'s SUMF ¶ 53.) As of 2010, Plaintiff was considered an industry analyst. (Pl.'s Dep. 14:21-16:9.) She did not, however, "do anything with P2P." (Pl.'s Dep. 190:3-6.[8])

Robert Hermida was a procurement engineer and Level 5 employee in Mr. Ravenfeld's organization. He also performed IT-related supplier research as part of a broader set of responsibilities supporting IT-related supplier agreements. (Def.'s SUMF ¶ 51.) His specific responsibilities included:

> [a]ssessing the technical requirements, functionality and configuration of IT products, proactively analyzing new IT products and industry trends, serving as a member of the Infrastructure Architecture Board (IAB), conducting IT product opportunity analysis, and making recommendations to internal Lockheed Martin clients, including programs, regarding new IT products and trends.

(Id. ¶ 52.) And, as stated above, P2P. (Id. ¶ 53.)

According to Mr. Hermida, Plaintiff provided financial industry analysis for projects that he supported, specifically for the IT segment. (Pl.'s Opp'n Br., Fessenden Cert., Ex. 24, Deposition of Robert Hermida, dated Apr. 25, 2013 ("Hermida Dep.") 52:16-20, 60:10-23

---

[8] Although Plaintiff cites to her own Exhibit 39 in support of her assertion that she *did* perform P2P work, this document does not support that conclusion, but rather is an email from Plaintiff to Mr. Hermida asking him for P2P-related information needed for another project because she has a "limited knowledge of P2P." (Pl.'s SDMF ¶ 129(k) (citing Fessenden Cert., Ex. 39).)

("[w]henever we worked together, I was the technology person and she provided financial analysis, industry analysis").) He further stated:

> Andrea has shown the ability to reach across the spectrum to deliver comprehensive informational resources. We have not missed a beat when I moved to P2P from a supplier analysis perspective for the IT segment . . . Andrea is respected as a knowledge resource from a supplier analysis perspective. Any data provided me has been accepted by others without question. It is a testament to her credibility in the area of supplier (financial and technical) analysis . . . Andrea took charge of the IT Research solution, it was a great help to me given my P2P responsibilities last year.

(Pl.'s Opp'n Br., Fessenden Cert., Ex. 29, Leader Workfile for Andrea de la Torre.) Mr. Ravenfeld also stated when Mr. Hermida went from performing financial analysis for IT suppliers and working on P2P to working predominantly on P2P, Plaintiff began providing supplier analysis specifically for the IT team. (Ravenfeld Dep. 268:3-24.)

### 5. Plaintiff's Request for Level 5 Classification and Compensation

Sometime in 2009, Plaintiff requested that she be permanently assigned to Mr. Hermida's position or recognized as a Level 5 employee and compensated accordingly. (Pl.'s Dep. 195:1-14; Pl.'s Aff ¶ 84.) She did not have any follow up with this issue. (Pl.'s Dep. 195:17-23.)

### 6. Plaintiff's May 2010 Transfer

In May 2010, Plaintiff was offered a position as a Systems Integration Analyst in GSCM after she applied and interviewed with the head of the group, Kathy Mullen, along with two other employees. (Def.'s SUMF ¶ 71;[9] Pl.'s Dep. 11:22-13:6.) Plaintiff is currently employed in that role. (Pl.'s Dep. 127:2-6.)

---

[9] Plaintiff disputes that Lockheed "offered her" this job because she applied according to Defendant's standard procedures and was interviewed for the position. (Pl.'s Resp. ¶ 71.) However, it certainly cannot be incorrect to say that after Plaintiff interviewed for this position and deemed qualified that she was not somehow offered the position. Plaintiff's objection, however, is duly noted.

## II. LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). A genuine dispute of material fact exists only if the evidence is such that a reasonable jury could find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When the Court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

If the party seeking summary judgment makes this showing, it is left to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" Corliss v.

Varner, 247 F. App'x. 353, 354 (3d Cir. Sept. 17, 2007) (quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the fact finder, not the district court. BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. DISCUSSION

Title VII of the Civil Rights Act of 1964 makes it unlawful for employers to "discriminate against any individual with respect to compensation, terms, conditions or privileges of employment, because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). Because New Jersey courts "have frequently looked to case law under Title VII . . . for guidance in developing standards to govern the resolution of LAD claims," the Court will analyze the NJLAD claims together with the Title VII claims. Carmona v. Resorts Int'l Hotel, Inc., 189 N.J. 354, 370 (2007).

These claims are analyzed under the burden-shifting approach set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the McDonnell Douglas framework, the plaintiff "bears the initial burden of establishing a prima facie case by a preponderance of the evidence." Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003) (citation omitted). To establish a prima facie case of discrimination in connection with failure to promote, a plaintiff must prove that (1) she was in a protected class, (2) she was qualified for the job to which she applied; and (3) another, not in the protected class, was treated more favorably. Scheidemantle

v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 539 (3d Cir. 2006) (citing McDonnell Douglas, 411 U.S. at 802-03).

"After an employee has established a prima facie case, this creates a presumption of discriminatory intent by the defendant-employer." Stewart v. Rutgers, The State Univ., 120 F.3d 426, 432 (3d Cir. 1997) (citation omitted) (explaining the McDonnell Douglas framework in the context of a § 1983 claim). "The burden then shifts to the defendant to produce evidence that the adverse employment action was taken 'for a legitimate, nondiscriminatory reason.'" Id. (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981)). "To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection, which would support a jury finding that unlawful discrimination was not the cause of the adverse employment action." Id. (internal quotation marks and citations omitted). "If the defendant's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case." Id. (citing Burdine, 450 U.S. at 260 (noting that "the defendant bears only the burden of explaining clearly the nondiscriminatory reasons for its actions")). "The burden then falls upon the plaintiff to prove that the 'employer's proffered reason [for the employment action] was not the true reason for the . . . decision,' but was instead pretextual." Id. (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508 (1993)).

In order to demonstrate pretext, the employee must show that her employer's proffered "reason was false, *and* that discrimination was the real reason." Hicks, 509 U.S. at 535. It is insufficient for a plaintiff to show that an adverse employment decision was merely "wrong or mistaken." Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (citations omitted). Instead, she must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions"

in the reasons articulated by the employer that a jury could reasonably "find them 'unworthy of credence.'" Id. (internal citations omitted).

Here, Plaintiff advances a two separate theories of liability. First, Lockheed discriminated against Plaintiff by failing to promote her to two positions for which she was qualified. Second, although Plaintiff performed work previously handled by a male, Lockheed Level 5, employee, Lockheed discriminated against her by failing to pay her a Level 5 wage.

The Court will evaluate each theory of liability in turn.

## A. Failure to Promote Claims

As an initial matter, the parties have identified a matter of disagreement in connection with the third element of a prima facie case of discriminatory failure to promote, which requires that another, not in the protected class, was treated more favorably by the employer. Certain courts within this circuit have described a fourth element in failure to promote claims, which requires a plaintiff to show that "the employer continued to seek out individuals with qualifications similar to . . . [the plaintiff's] . . . to fill the position," Iyer v. Everson, 382 F. Supp. 2d. 749, 756 (E.D. Pa. 2005), or that "the person who filled the desired position had equivalent or lesser qualifications," Gilmore v. Macys Retail Holdings, Inc., 385 F. App'x 233, 237 (3d Cir. 2010). Thus, Lockheed argues that Plaintiff must show that her qualifications were at least equal to each successful candidate. (Lockheed Mem. in Support of Mot. for Summ. J. ("Lockheed Br.") 9-13.) Plaintiff argues, however, that Lockheed misstates the relevant test and thus she need not demonstrate that the challenged promotion went to someone with equal or lesser qualifications in order to establish a prima facie case. (Pl.'s Mem. in Opp'n to Lockheed Mot. for Summ. J. ("Pl.'s Opp'n Br.") 20.)

A Third Circuit panel confronted with the same question has observed that "there is support in our prior jurisprudence for both views." Taylor v. Cherry Hill Bd. of Educ., 85 F. App'x 836, 839 n.3 (3d Cir. 2004) (comparing Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 523 (3d Cir. 1992) (holding that attorney who claimed she was passed over for law firm partnership because of her gender need only show at prima facie stage that "[s]he was sufficiently qualified to be among those persons from whom a selection ... would be made") with Jewett v. Int'l Tel. & Tel. Corp., 653 F.2d 89, 91 (3d Cir. 1981) (holding in failure-to-promote context that plaintiff failed to make out a prima facie case because person who was promoted had "superior qualifications")). However, the Third Circuit panel in Taylor did not resolve this seeming conflict in precedent, instead deciding the case on other grounds. 85 F. App'x at 839-40. Nor does it appear that a definitive answer has been provided since that time.

In support of her proffered test for a prima facie case, Plaintiff cites Scheidemantle, which required the plaintiff to "demonstrate that (a) she was a member of a protected class, (b) she was qualified for the [] job to which she applied, and (c) another, not in the protected class, was treated more favorably." 470 F.3d at 539. However, the Scheidemantle case favorably referred to the conclusion of a district court that a plaintiff must show as part of a prima facie case that she was at least as qualified as the person selected for the position. Id. at 540-41 (citing Pinckney v. Cnty. of Northampton, 512 F. Supp. 989, 998 (E.D. Pa. 1981)). The Scheidemantle case also indicated that under the McDonnell Douglas framework, the "more favorable treatment" element includes "seeking someone 'of complainant's qualifications' after rejecting the complainant." Id. n.7 (citation omitted). Further, in a non-precedential opinion filed after this motion was fully briefed, the Third Circuit again emphasized this requirement, upholding a summary judgment ruling in favor of an employer because, for a plaintiff to prove gender

14

discrimination in a failure-to-hire case, he "must adduce evidence sufficient for a juror to find that he was more qualified for the position than the female candidate that the . . . [employer] . . . interviewed." Besko v. N.J. Juvenile Justice Comm'n, No. 13-3234, 2014 WL 929171, at *3 (3d Cir. Mar. 11, 2014).[10]

Thus, the Court finds that it is consistent with Third Circuit law to require a plaintiff to show, as part of the third element requiring "more favorable treatment," under the McDonnell Douglas framework, that she was at least equally qualified to the person who obtained the desired position. See Gilmore, 385 F. App'x at 237 (citation omitted) (finding the plaintiff "was required to establish a prima facie case by evidence, among other things, that the person who filled the desired position had equivalent or lesser qualifications"); see also Rogers v. Alt. Res. Corp., 440 F. Supp. 2d 366, 371 (D.N.J. 2006) ("[i]n order to establish a prima facie case in a failure to promote claim, the plaintiff must prove by a preponderance that . . . (4) nonmembers of his protected class were treated more favorably-alternatively stated, that the promotion went to someone with equal or lesser qualifications who was not in the protected class"); Pinckney, 512 F. Supp. at 998, aff'd, 671 F.2d 808 (3d Cir. 1982) (a plaintiff must "demonstrate that she was as qualified as the promoted person"). After all, if an applicant is objectively more qualified for a given position, the employer does not treat him "more favorably" vis-à-vis the discriminated plaintiff by awarding him or her the desired position. See Rogers, 440 F. Supp. 2d at 371 (explaining that the "equal or lesser qualifications" requirement is really part of the "treated more favorably" test). Rather, where one applicant is objectively more qualified, the employer treats

---

[10] Although the Besko case appears to articulate an even higher standard than that advocated by Lockheed, requiring a plaintiff to show that he or she is more qualified than other applicants, the Court will only search here for a showing that Plaintiff was at least as qualified as the successful applicants to the positions she sought.  In light of Besko's non-precedential status and the existence of precedential cases described in this section requiring only a showing of similar qualifications to the chosen applicant, the Court will not read Besko as introducing any heightened showing necessary to make out a prima facie case of discrimination.

each of them as favorably as should be expected, given the superior qualifications of one applicant over another.

With respect to the two promotions Plaintiff challenges as discriminatory, the Court will look to whether she has demonstrated that she was at least as qualified as the chosen candidate in determining whether she has set forth a prima facie case of discrimination. In so doing, the Court will draw all inferences as to Plaintiff's qualifications in her favor, as she is the nonmoving party. See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 278 (3d Cir. 2000) (citation omitted).

i. The promotion of John Seto into a team lead role

In January 2008, shortly after Plaintiff began reporting to Mr. Ravenfeld, Mr. Ravenfeld selected Mr. Seto, one of his direct reports and a Level 4 Procurement Engineer, for a team lead role. (Def's. SUMF ¶ 10.) Eventually, these duties became a permanent part of Mr. Seto's assignment and his Job Level increased from Level 4 to Level 5. (Id. ¶ 13.)

Plaintiff alleges that Mr. Seto's promotion over her for this team lead role was gender based. (Fourth Am. Compl. ¶ 184.) In support of this allegation, she argues that Mr. Ravenfeld's decision to promote Mr. Seto was due to a discriminatory, male-centric culture in Mr. Ravenfeld's department. (Pl.'s Opp'n Br. 25.) According to Plaintiff, Mr. Ravenfeld was "largely focused on the work performed by his male reports," and socialized with these employees, including Mr. Seto, inside and outside of the office, while excluding Plaintiff from these activities. (Pl.'s Aff. ¶¶ 44-45.[11])

---

[11] Lockheed takes issue with this portion of Plaintiff's affidavit; however, as her statements are premised upon her personal knowledge of her work environment, they are properly considered by the court in resolving the instant motion.

When Plaintiff learned of Mr. Ravenfeld's decision to place Mr. Seto in the team lead role, she complained to Mr. Ravenfeld in writing. (Pl.'s SDMF ¶ 54.) Although her complaint did not contain any gender discrimination allegations, Plaintiff took issue with the fact that (1) she was more qualified than Mr. Seto for a number of reasons including the fact that she had previous experience that would have been pertinent to this newly created role, and (2) the position was not posted so she was unable to apply prior to the position being filled.[12]

Lockheed argues that Plaintiff was not similarly situated to Mr. Seto such that she cannot establish a prima facie case of discrimination with respect to this particular employment decision. (Lockheed Br. 11-13.) Specifically, Mr. Ravenfeld testified that Mr. Seto was selected for the team lead role because (1) he was a consistently high performing employee and had received "Exceptional" performance ratings, (2) he was designated a high potential employee under Lockheed's talent planning system, and (3) he had expertise in strategic planning and procurement engineering. (Ravenfeld Dep. 161:4-163:19.) Mr. Seto had also reported to Mr. Ravenfeld for several years prior to his promotion. (Def.'s SUMF ¶ 12.) Comparatively, Plaintiff was only rated a "Successful Contributor" in 2006 and 2007, she was never rated an "Exceptional" performer, she was not designated as a high potential employee, and she lacked strategic planning and procurement engineering experience because she was a financial analyst, not a procurement engineer. (Def.'s SUMF ¶¶ 4, 61, 62, 70.)

---

[12] Plaintiff specifically states:

> With this historical data in mind, you can glean insight to my perception of the organizational announcement released earlier today. A lead position with multiple direct reports has been created and filled within the same organization and function that I successfully served in a leadership role just a few months earlier, yet I received no communication regarding the intended organization change/opportunity until the position was filled. To the best of my knowledge the individual assigned to this lead position has no previous leadership experience in GSCM/Lockheed Martin. I am curious to understand how you reconcile these facts with a commitment to "treat others with dignity, respect and fairness."

(Pl.'s SDMF ¶ 54 (citing Fessenden Cert., Ex. 10).)

As to Plaintiff's prima facie case, Lockheed never posted the team lead position, nor did it create any corresponding job description. As such, there is no means by which the Court could decide, as a matter of law, that Plaintiff was not qualified for the team lead role, or that she was not at least equally as qualified as Mr. Seto. See Hertzog v. City of Watertown, No. 07-213, 2007 WL 5514740, at *3 (W.D. Wis. Sept. 6 2007) (denying both parties' motions for summary judgment because no job description or written qualifications existed which precluded a summary judgment finding as to qualifications and pretext). Because there is no measuring stick by which the Court could determine whether Plaintiff was as qualified as Mr. Seto, and because Plaintiff has satisfied the other elements of a prima facie case of discrimination—she is in a protected class and there is no dispute in the record that she was qualified for this position—the Court must find that Plaintiff has established a prima facie case with respect to this position.

Moving on to whether Plaintiff has shown that Lockheed's explanation for Mr. Seto's promotion was pretextual, Lockheed argues that even if Plaintiff established a prima facie case, she cannot show that Lockheed's stated reasons for promoting Mr. Seto into the team lead role— his performance, potential, and experience—were pretext for unlawful discrimination. (Lockheed Br. at 13-15.) Simply, the decision to promote Mr. Seto was based on his "Exceptional" performance ratings, "high potential" designation, and proven expertise in strategic planning and procurement engineering. (Lockheed Br. 13.) Although Plaintiff believed she was a better candidate than Mr. Seto, Lockheed was ultimately responsible for determining which candidate was best qualified for the team lead role, and Plaintiff cannot establish pretext by substituting her judgment regarding which qualifications should have been considered. (Id. at 14-15.)

Plaintiff counters that when the team lead position was announced, Mr. Ravenfeld stated that Mr. Seto's responsibilities would be "team leadership, including objectives identification, project execution, team collaboration, and communications and status reporting." (Pl.'s Opp'n Br. 29 (citing Ravenfeld Dep. 158:11-19).) There was no indication that the position entailed "procurement engineering" or "strategic planning," and thus the criteria now identified by Lockheed is nothing more than a post hoc rationale for awarding Mr. Seto the position rather than Plaintiff. (Id.)

While, the Third Circuit has observed that "[p]ost hoc explanations, like any self-helpful statement made after the initiation of lawsuit, may be to some degree suspect," the idea that a "post hoc justification ipso facto creates a pretext . . . is plainly wrong." Healy v. New York Life Ins. Co., 860 F.2d 1209, 1215 (3d Cir. 1988). Regardless, Plaintiff's argument fails to take account of the full scope of the record.

Although Plaintiff argues that the qualifications for the team lead role changed after Mr. Seto was awarded the position, a review of Mr. Ravenfeld's deposition actually reveals that Mr. Seto was chosen for the team lead role because his experience in strategic planning and procurement engineering were valuable skills that fit well with the team lead role's responsibilities of "team leadership, including objectives identification, project execution, team collaboration, and communications and status reporting." (See Ravenfeld Dep. 163:21-163:19.[13]) Further, while Mr. Seto received "Exceptional" contributor ratings in 2005, 2006, and 2007, Plaintiff only received a "High Contributor" rating in 2005, and "Successful Contributor" ratings in 2006 and 2007. (Def.'s SUMF ¶ 62.)

---

[13] Mr. Ravenfeld further testified that Mr. Seto's procurement engineering experience stemmed from "his educational background, having worked outside of Lockheed [ ] in a capacity with another high tech company. Also as the procurement engineering point of contact for our direct commodities for a number of years." (Ravenfeld Dep. 163:21-163:19.)

Although Plaintiff takes pains to distinguish her qualifications from Mr. Seto's emphasizing that she had more of the kind of experience required for the team lead role—e.g., she had an advanced degree, while Mr. Seto did not, (Pl.'s SDMF ¶ 83(a))—Plaintiff largely makes assumptions about Mr. Seto's experience without grounding any of those assumptions in fact. To illustrate, Plaintiff states that she had previous leadership experience that trumped Mr. Seto's because she had a direct report in GSCM, while he did not. (Id.) But, Plaintiff bases this conclusion on her own information and belief, which is plainly insufficient for purposes of creating a genuine issue of material fact. See Fairview Ritz Corp. v. Borough of Fairview, No. 9-875 JLL, 2013 WL 5946986, at *19 (D.N.J. Nov. 6, 2013), recons. den., 2013 WL 6865561 (D.N.J. Dec. 20, 2013) (citing Olivares v. U.S., 447 F. App'x. 347, 351 n.6 (3d Cir. 2011) (Federal Rule of Civil Procedure 56's "requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'")).

Plaintiff also states that she was hired one year prior to Mr. Seto, and that they worked on the same or similar projects at Mr. Ravenfeld's discretion. (Pl.'s SDMF ¶¶ 82-83.) However, a plaintiff cannot show pretext merely by demonstrating that she has more years of experience or possesses some of the same qualities as the selected candidate. See Walters v. Norton, 326 F. App'x 644, 649 (3d Cir. 2009) (the hiring of a candidate with twelve years of auditing experience over one with sixteen years of auditing experience was not evidence of pretext). Rather, she must show that Lockheed's proffered reasons could be found to be "unworthy of credence," Fuentes, 32 F.3d at 765, and she simply has not done so.

Simply, the Court's review of the record reveals that although Plaintiff she believed she was better suited for the team led role than Mr. Seto, she has not identified "weaknesses, implausibilities, inconsistencies, incoherence or contradictions" advanced by Lockheed for the

promotion of Mr. Seto, such that a reasonable fact-finder could find them "find them unworthy of credence." Id. Further, her general allegations of a boy's club-type environment are insufficient to overcome the legitimate reasons advanced by Lockheed for the selection of Mr. Seto for the team lead role. See McGuigan v. Sec'y of U.S. Dep't of Treasury, 435 F. App'x 382, 385 (3d Cir. 2005) ("Evidence that [the selected candidate] was friends with [a member of the interview panel] does not trump the neutral reasons offered by [the hiring manager] and the interview panel.").

Even though Plaintiff believed that she was more qualified than Mr. Seto, her subjective belief, without more, "does not create an issue of fact for the jury," Dungee v. Ne. Foods, Inc., 940 F. Supp. 682, 689 (D.N.J. 1996) (citation omitted). Therefore, thus summary judgment will be granted in connection with this position.

ii. The selection of Kurt Wohlgemuth for the Level 5 Operations Researcher Senior Staff role

In August 2008, Lockheed appointed Mr. Buonanni as the Director of the newly created Strategic Supplier Management group in GSCM. (Def.'s SUMF ¶¶ 16-17.) Mr. Buonanni was given the authority to hire three direct reports, one of which was going to be for a Level 5 Operations Researcher Senior Staff role. (Id. ¶¶ 20, 26.) Mr. Buonanni testified that in reviewing application materials for the Level 5 position, he was particularly interested in seeing (1) risk management and risk mitigation experience, and (2) experience leading cross-Business Area teams. (Def.'s SUMF ¶ 29.) He eventually selected three male candidates to interview for the Level 5 position, including Kurt Wohlgemuth, and awarded the job to him.

Plaintiff contends that Mr. Buonanni's asserted reasons for selecting Mr. Wohlgemuth were pretextual. First, out of eighteen (18) candidates who applied for the Level 5 position, only three (3) were women, and none of these three women were selected for an interview. (Pl.'s

Opp'n Br. 32 (citing Def.'s SUMF ¶ 28).) Second, Plaintiff testified that Mr. Buonanni told her

that it did not matter whether she was hired into the Level 4 or Level 5 position because he had

not yet determined who was going to do what in those two jobs. (Id. (citing Pl.'s SDMF ¶

151).[14]) Third, although Mr. Buonanni did not select Plaintiff for an interview based on the

information on her resume and his knowledge of her work, he never spoke with Plaintiff about

her qualifications prior to his selection of interview candidates and she did in fact have the

experience he was looking for, i.e., "risk management." (Id. at 33.)

Lockheed argues, inter alia, that it is undisputed that Mr. Buonanni independently

assessed Plaintiff's resume and determined that it did not reflect the experience he considered to

be important for the Level 5 position. (Lockheed Br. 18.) Further, Mr. Wohlgemuth was

selected because he had risk management experience and he also had experience leading cross

functional, cross-Business Area Integrated Product Teams. (Id. at 16.)

Based on a review of the record, it is apparent that the only fact Plaintiff sets forth in

support of her contention that Mr. Wohlgemuth was equally or less-qualified compared to

herself, is a single excerpt from her deposition during which she testified that Mr. Wohlgemuth

told her that "I have never done work like this before," and a corresponding statement in her

Affidavit (without supporting citation) that Mr. Wohlgemuth told her that "he did not have any

experience in supplier risk management but he had previously worked with Mr. Buonanni."

(Pl.'s Dep. 147:8-14; Pl.'s Aff. ¶ 69.) Even if Mr. Wohlgemuth made this statement, the record

reflects that his resume specifically listed that he had experience in risk management; Plaintiff

---

[14] Lockheed objects to this portion of Plaintiff's testimony as being hearsay and inconsistent with other portions of
the record. (Def.'s Resp. ¶ 151.) However, Mr. Buonanni could certainly testify at trial to this statement and,
viewing the facts in the light most favorable to Plaintiff, a jury could find that although the job postings for the
Level 4 and 5 position differed on paper, Mr. Buonanni was the ultimate arbiter as to what qualifications would be
required. Regardless, however, as the Court discusses infra, because Plaintiff has not made out a prima facie case
for this position, this issue has little significance.

concedes this fact.  (Pl.'s Opp'n Br. 34.)  And it appears that as a Business Partner and Financial

Consultant in Lockheed's Enterprise Business Services—one of Lockheed's five Business

Areas—he provided business consultation and financial reporting and management to several

"VPs" in Lockheed's IT Division, another Business Area.  (Burkhardt Decl., Ex. 15 (Resume of

Kurt H. Wohlgemuth).)  Further, Mr. Wohlgemuth was already a Level 5 employee.  (See

Burkhard Decl., Ex. 8 (Resp. to Pls.' May 2012 Interrog. at No. 66(l)).[15])

Aside from stating in a conclusory fashion that Plaintiff performed "risk management"

work in the past, and thus was qualified for the Level 5 position, a review of her resume reveals

no such designation; indeed, it emphasizes her experience in risk analysis.  (See Pl.'s Opp'n Br.,

Fessenden Cert., Ex. 1).)

Even viewing the facts in the light most favorable to Plaintiff, a jury could not conclude

that Mr. Wohlgemuth's alleged statement to Plaintiff somehow created an issue of fact as to

whether he similarly or less qualified than Plaintiff when he was already a Level 5 employee, his

resume indicated that he had performed risk management work, and that he had experience

leading cross-Business Area Integrated Product Teams.  Accordingly, Plaintiff has not

---

[15] Plaintiff argues that certain of Lockheed's interrogatory responses as to the nondiscriminatory reasons for hiring decisions are inadmissible for purposes of summary judgment because they are certifications made by Lockheed managers responsible who do not have personal knowledge of the facts set forth.  (Pl.'s Resp. ¶ 34.)  This argument is misplaced.  Lockheed is entitled to rely upon interrogatories in support of summary judgment.  Fed R. Civ. P. 56(c)(1)(A).  When a party responding to interrogatories is a corporation, an authorized agent must be designated to verify the interrogatory responses.  The agent is not required to have personal knowledge of the responses.  See Andrews v. Home Depot, Inc., No. 03-5200, 2008 WL 3821792, at *2 (D.N.J. Aug. 12, 2008).  Although a party may ask for a person with personal knowledge to respond to interrogatories, there is no indication in the record that Plaintiff did so with respect to the interrogatories that she objects to.  See id.

established a prima facie case of discrimination, and summary judgment will be granted with respect to this position.

### B. Wage Discrimination Claim

Finally, Plaintiff argues that she was underpaid because of her gender while performing the job duties of a male, Level 5 employee. Specifically, from 2008 to 2010, Plaintiff began filling in for Mr. Hermida, and performing work that he normally would have performed. (Pl.'s Dep. 57:4-9.) Plaintiff testified that once she returned from her leave of absence, she was informed by Mr. Ravenfeld and Mr. Seto that 20 percent of her responsibilities were to be "EO event leadership," and the rest of her time would be Industry Analysis and "taking on the responsibilities that Bob Hermida . . . did not have time to do for the IT Group." (Id. 26:23-27:11.) Thus, Plaintiff contends that because Mr. Hermida was paid as a Level 5 for this work, and Plaintiff performed the same work, she should have been elevated from a Level 4 to Level 5 position and paid accordingly. (Pl.'s Opp'n Br. 37.)

Lockheed argues that it is entitled to summary judgment on Plaintiff's wage discrimination claim for several reasons. First, Plaintiff's assumption of duties previously performed by Mr. Hermida did not increase the scope of her job, but were intended to replace her prior duties that had been transferred to Mr. Buonanni's group; as a result, there was no reason for her Job Level to change. (Lockheed Br. 20-21.) Second, Mr. Hermida does not qualify as a similarly situated male employee that was treated more favorably than Plaintiff. (Id. at 22.) Not only did Plaintiff concede that she did not know the full scope of Mr. Hermida's responsibilities, (Def.'s SUMF ¶ 57), but she did not perform the same duties as Mr. Hermida (indeed, the bulk of his duties related to the P2P project, on which Plaintiff had no responsibilities). (Id.) Additionally, unlike Mr. Hermida, Plaintiff was not a procurement engineer. (Id.)

To maintain a wage discrimination claim, a plaintiff must show that "employees . . . were paid differently for performing 'equal work'—work of substantially equal skill, effort and responsibility, under similar working conditions." <u>Stanziale v. Jargowsky</u>, 200 F.3d 101, 107 (3d Cir. 2000) (citation omitted). "Different positions with different qualifications, even if they are superficially comparable, are not 'similarly situated' for purposes of establishing a prima facie wage discrimination claim." <u>Nagle v. RMA, Risk Mgmt. Ass'n</u>, 513 F. Supp. 2d 383, 388-89) (E.D. Pa. 2007) (citation omitted).

In this case, Plaintiff has not proffered sufficient evidence to show disparate treatment in pay. Although Plaintiff argues that she performed "exactly," the same work as Mr. Hermida, the record reveals a different reality.

As a procurement engineer, Mr. Hermida "assess[ed] the technical requirements, functionality and configuration of IT products, proactively analyzing new IT products and industry trends, . . . conduct[ed] IT product opportunity analysis, and ma[de] recommendations to internal Lockheed Martin clients, including programs, regarding new IT products and trends." (Def.'s SUMF ¶¶ 51-52.) Mr. Hermida was also heavily involved in the P2P procurement project. (<u>Id.</u> ¶ 53.)

Comparatively, when Plaintiff "took over Mr. Hermida's responsibilities," she provided financial and industry analysis for the IT segment. (<u>See</u> Hermida Dep. 52:16-20, 60:10-23 ("[w]henever we worked together, I was the technology person and she provided financial analysis, industry analysis").) Indeed, Mr. Hermida emphasized that Plaintiff's work was concentrated in supplier analysis, while Mr. Hermida spent more and more time on the P2P project. (Pl.'s Opp'n Br., Fessenden Cert. Ex. 29; <u>see also</u> Ravenfeld Dep. 268:3-24 (stating that when Mr. Hermida went from performing financial analysis for IT suppliers and working on P2P

to working predominantly on P2P, Plaintiff began providing supplier analysis specifically for the IT team).)

Even though Plaintiff may have assumed responsibilities that were previously assigned to Mr. Hermida, at no point, does she indicate that she "assessed the technical requirements, functionality and configuration of IT products," nor does she indicate that she performed any P2P work.

Because the record shows that there are actually significant differences between Mr. Hermida and Plaintiff's positions—they performed different job duties that required different skills—Plaintiff fails to create a genuine issue of material fact as to whether she and Mr. Hermida are similarly situated, and thus cannot establish a prima facie wage discrimination claim.  See Nagle, 513 F. Supp. 2d at 388-89; see also Frintner v. TruePosition, 892 F. Supp. 2d 699, 712 (E.D. Pa. 2012) (where record demonstrated significant differences between the actual duties and skills of male comparators and those of the female plaintiff, defendant was entitled to summary judgment on disparate compensation claim under Title VII).

Accordingly, summary judgment in favor of Lockheed is warranted as to Plaintiff's unequal pay claim.

## IV.    CONCLUSION

For the reasons stated above, the Court will **GRANT** Lockheed's motion for summary judgment.  An appropriate order shall issue today.


Dated:  6/30/2014                                                    s/ Robert B. Kugler
                                                                     ROBERT B. KUGLER
                                                                     United States District Judge